**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MELISSA SUE SPATARO,** | : | **Civil No.  1:22-CV-661** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

In March of 2020, Melissa Spataro applied for Social Security benefits alleging that she had become totally disabled beginning on June 15, 2019 due to depression, anxiety, post-traumatic stress disorder, and multiple personality disorder. In assessing this disability claim the Administrative Law Judge (ALJ) assigned to Spataro's case was confronted by a divergence of medical opinions and a striking disparity between the medical notations contained in Spataro's treatment records and the medical opinions expressed by her treating sources.

With respect to this factual disparity, over a two-year period Spataro's treating sources described her appearance, speech, affect, mood thought processes and content, intellect, and orientation as normal. Further, these treatment notes stated

1

that Spataro suffered only a moderate degree of impairment due to her emotional conditions. Moreover, these treatment notes documented improvements in Spataro's overall condition, indicated that her anxiety was relatively well controlled, and contained notations in which Spataro expressed a willingness and apparent ability to perform some work. Notwithstanding these fairly benign treatment records spanning two years, Spataro's treating sources provided the ALJ with extreme and extremely disabling medical opinions. In contrast, state agency experts who examined the same treatment records opined that Spataro could perform some work, and this conclusion was echoed by a consulting examining medical source.

Presented with this conflicting evidence, and recognizing that consistency and supportability are the keystones to medical opinion analysis, the ALJ found that the opinions of the medical sources who concluded that Spataro could perform some work were more congruent with the plaintiff's actual treatment history and denied Spataro's claim. Spataro now appeals this decision, arguing that the ALJ erred in assessing the medical opinion evidence and in determining her own residual functional capacity. (Doc. 14).

We evaluate this appeal against a highly deferential standard of review, one which calls upon us to affirm the decision of the ALJ if that decision is supported by "substantial evidence":

[A] "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>IbId.</u>; <u>see</u>, <u>e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

Mindful of the fact that substantial evidence, "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that the ALJ adequately addressed the evidence in this case when concluding that Spataro had not met the exacting standard for demonstrating an entitlement to disability benefits. Further, substantial evidence supported the ALJ's disability determination in this case, denying Spataro's claim. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

II.   **Statement of Facts and of the Case**

On March 11, 2020, Melissa Spataro applied for disability and supplemental security income benefits under Titles II and XVI of the Social Security Act, alleging an onset of disability on June 15, 2019.  (Tr. 27). Spataro was born in 1971, was 48 years old at the time of the alleged onset of her disability, and was defined as a younger worker under the Commissioner's regulations. (Tr. 92). Spataro had  earned her GED and had prior recent employment as a security guard, hostess, and house sitter. (Tr. 276). In this disability application, Spataro alleged that she was disabled due to Depression, Anxiety Disorder, PTSD (Post-traumatic Stress Disorder), and Multiple Personality Disorder. (Tr. 30).

During the pertinent time period, Spataro was treated for these conditions at Blue Mountain Psychiatry. (Tr. 390-706). These treatment records indicated that Spataro began treating with Blue Mountain in October of 2018, (Tr. 624), and continued to treat with the medical practice through September 2020. (Tr. 435, 663). During this period, Spataro's care-givers documented more than twenty clinical encounters with the plaintiff.(Tr. 390-706).

These treatment records were noteworthy in several respects. First, these records consistently described Spataro's appearance, speech, affect, mood, thought processes and content, intellect, and orientation as normal. (Tr. 392, 396, 399, 400,

415, 420, 422, 425, 428-29, 431-32, 435, 437, 589, 591-96, 663, 665, 667, 676, 679, 694). Spataro's insight was also routinely described as normal or adequate. (Id.)

Moreover, her caregivers also typically rated Spataro's Global Assessment of Functioning or GAF score as ranging between 54 and 60. (Tr. 409, 420, 422, 425, 600). This, too, was a significant clinical finding since a GAF score was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or

school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). Jones v. Colvin, No. 1:16-CV-1535, 2017 WL 4277289, at *2 (M.D. Pa. Sept. 25, 2017), report and recommendation adopted sub nom. Jones v. Berryhill, No. 1:16-CV-1535, 2017 WL 4314572 (M.D. Pa. Sept. 27, 2017). Thus, the GAF scores recorded by Spataro's treating staff were consistent with no more thana moderate level of functional impairment.

6

The narratives accompanying these treatment notes were also illuminating on several scores. These notes indicated that Spataro's anxiety was relatively well controlled on her current medications, (Tr. 392, 396, 399-400, 415, 420, 422, 425, 428-29, 431-32), and described her mood as stable. (Tr. 409). In fact, the treatment notes provided by Spataro's counselor, Kenneth Fulton-Resig, recorded improvement in her condition over time. Thus, on January 16, 2020, Fulton-Resig reported that Spataro has been doing well, and on February 13, 2020, he noted that Spataro had described some major revelations she had attained. (Tr. 402-03). By April 27, 2020, Fulton-Resig stated in his treatment notes that Spataro "has been doing much better in the past few months than ever before." (Tr. 394).

Finally, these treatment notes indicated that Spataro had an ongoing interest and perceived ability to work. As early as November 13, 2018, Spataro reported that she was employed as a security guard at a school. (Tr. 598). In April of 2019, Spataro admitted to experiencing depression when working night shifts. (Tr. 431). In December of 2019, Spataro described looking for work and receiving a job offer which she intended to accept. (Tr. 410-11). Further, by January of 2020, in her treatment sessions with Fulton-Resig Spataro discussed "her current working situation, and ability to work (small shifts) to gain money for short term travel." (Tr. 406).

It was against this clinical backdrop that several medical sources opined regarding the degree to which Spataro could meet the emotional demands of the workplace. At the outset, two state agency experts who reviewed Spataro's treatment records found, consistent with those records, that she was only moderately impaired. Initially, on June 24, 2020, Dr. Stacie Barnes concluded that these impairments were not wholly disabling. (Tr. 92-112). According to Dr. Barnes, Spataro's treatment records revealed that she was moderately limited in terms of her ability to follow detailed instructions, maintain concentration for extended periods, work at a consistent pace,  interact with others, and respond to workplace changes. (Tr. 97-99). However, Spataro retained the ability to perform simple tasks in a stable environment. (Tr. 99).

On September 23, 2020, upon agency reconsideration, a second state agency expert, Dr. Susan Malkoff Schwartz, reached similar conclusions regarding Spataro's ability to meet the mental demands of the workplace. (Tr. 115-38). Dr. Schwartz concluded that Spataro was moderately limited in following simple instructions, had marked limitations in following complex directions, and was moderately limited in terms of her ability to maintain concentration, work on schedule, complete tasks, and interact with others. (Tr. 121-22). Nonetheless, Dr. Schwartz found that Spataro was not completely disabled because she was able to

carry out simple and short instructions and make simple workplace decisions. (Tr. 122).

A separate, examining consultative source, Dr. James Truscott, reached similar conclusions regarding the degree to which Spataro's emotional impairments were disabling. (Tr. 713-20). Following a February 11, 2021 examination, Dr. Truscott described Spataro's posture, behavior, eye contact, and speech as normal. (Tr. 715-16). He concluded that she was coherent and goal oriented in her thought process, displayed good insight and judgment, was fully oriented, and had an appropriate affect and average cognitive functioning. (Tr. 716). Based upon these examination findings, Dr. Truscott opined that Spataro was mildly impaired in carrying out instructions, but only moderately impaired when it came to interacting with others. (Tr. 718-19).

In stark contrast to these treatment notes and medical opinions were the medical opinions proffered by two of Spataro's treating sources. On July 30, 2019, Dr. Rifai at Blue Mountain Psychiatry competed a check box form which stated that Spataro suffered from marked impairments in all spheres of workplace activity. (Tr. (Tr. 545-49). The doctor's cursory report did not reconcile these extreme findings with the two years of relatively benign treatment notes generated by his medical practice.

9

In addition, Spataro's counselor, Kenneth Fulton-Resig, submitted two medical source statements regarding the plaintiff in March and November of 2020. (Tr. 387-89, 701-03). These two statements were difficult to reconcile with one another, and were inconsistent with Blue Mountain's contemporaneous treatment notes. For example, in March of 2020, Fulton-Resig reported that Spataro had no impairment following simple instructions, moderate impairments in some other work spheres, and marked or extreme impairments in maintaining concentration and interacting with others. (Tr. 387-89). Yet on April 27, 2020, Fulton-Resig stated in his treatment notes that Spataro "has been doing much better in the past few months than ever before." (Tr. 394). Moreover, other treatment notes from March 2020 described Spataro's appearance, speech, affect, mood, thought processes and content, intellect, and orientation as normal. (Tr. 399). By November 2020, Fulton-Resig's opinion had apparently changed dramatically, and he now asserted that Spataro faced extreme limitations in nearly all intellectual aspects of workplace functioning. (Tr. 701-03). However, this sudden shift in Fulton-Resig's assessment was not borne out by treatment notes, which continued to describe Spataro's appearance, speech, affect, mood, thought processes and content, intellect, and orientation as normal. (Tr. 435, 437).

10

Fulton-Resig testified at Spataro's disability hearing before the ALJ and was asked to reconcile his extreme medical opinions with the treatment notes which repeatedly described the plaintiff's mental state as normal. (Tr. 55-69).  In response to these questions, Fulton-Resig attempted to harmonize these discordant reports by suggesting that "normal" simply meant normal for Spataro. (Tr. 68). The ALJ rejected this strained interpretation of these records, calling it "just not persuasive and highly disingenuous in light of the complete record." (Tr. 32).

It is against this factual backdrop that the ALJ conducted a hearing in this case on January 22, 2021. (Tr. 48-91). Spataro, her counselor, and a Vocational Expert testified at this hearing. (Id.) Following this hearing on April 30, 2021, the ALJ issued a decision denying Spataro's application for benefits. (Tr. 24-39). In that decision, the ALJ first concluded that the plaintiff met the insured status requirements of the Act through September 30, 2021. (Tr. 30). The ALJ further found that Spataro had not engaged in substantial gainful activity since her alleged date of onset of disability, June 15, 2019. (Id.) At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Spataro's Depression; Anxiety Disorder; PTSD (Post-traumatic Stress Disorder); and Multiple Personality Disorder were all severe impairments. (Id.)  At Step 3 the ALJ determined that these emotional impairments imposed only moderate limitations upon the plaintiff and

11

concluded that Spataro did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 30-31).

The ALJ then held that Spataro retained the following residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to understand, retain and carry out simple, 1-2 step instructions with few work place changes. The claimant can perform occasional decision-making. She must avoid fast, production rate pace work and she must avoid noise above level 3 noise intensity level. The claimant should avoid interaction with the public except incidental contact. She can engage in occasional interaction with co-workers and supervisors; however, she should avoid group, team or tandem work activities.

(Tr. 32).

In reaching this RFC determination the ALJ painstakingly examined Spataro's treatment history and the medical opinion evidence. (Tr. 30-37). Thus, the ALJ documented the frequent, and frequently benign, clinical findings reported by Spataro's care-givers. (Id.) As the ALJ aptly observed, these treatment records were replete with references to Spataro's normal appearance, speech, affect, mood, thought processes and content, intellect, and orientation. The ALJ also took into account the GAF scores assessed by these caregivers, which were emblematic of no

12

more than a moderate degree of impairment, and cited the narrative portions of these treatment notes which frequently reported that Spataro was responding well to therapy. (Id.) The ALJ also assessed the medical opinion evidence in this case, finding that the state agency medical consensus and the opinion of the consulting examining source Dr. Truscott, all of whom concluded that Spataro could meet the mental demands of the workplace, were congruent with the treatment records and were, therefore, persuasive. In contrast, the ALJ found that the extreme and extremely limited opinions voiced by Mr. Fulton-Resig and Dr. Rifai were directly contradicted by their own treatment notes and were unpersuasive. (Tr. 36-38).

Given this RFC determination, the ALJ found that Spataro retained the capacity to perform jobs that existed in significant numbers in the national economy. (Tr. 38). Having reached these conclusions, the ALJ concluded that the plaintiff had not met the demanding showing necessary to sustain her claim for benefits and denied this claim. (Tr. 39).

This appeal followed. (Doc. 1). On appeal, Spataro argues that that the ALJ erred in assessing the medical opinion evidence and in evaluating her own residual functional capacity. (Doc. 14). However, given the highly deferential standard of review which applies here, we are constrained to conclude that substantial evidence

supported the ALJ's findings in this case. Therefore, for the reasons set forth below, the Commissioner's decision will be affirmed.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." IbId.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

16

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id.</u> at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess</u>, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which

17

would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B.**     **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at Step 2 of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Colvin, 962 F.Supp.2d 761,778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11– 2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has

been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise where well-supported medical sources have identified limitations supporting a disability claim, but an ALJ has rejected such a determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic

view and have sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.      **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in March of 2020, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning

"weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

It is against these benchmarks that we assess this appeal.

### D.   The Commissioner's Decision Will Be Affirmed.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," Pierce, 487 U.S. at 565, but rather "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek, 139 S. Ct. at 1154.

Judged against these deferential standards of review, we find that the evidence supported the ALJ's decision that Spataro was not entirely disabled, but rather could perform work limited to simple tasks. On appeal, Spataro challenges the sufficiency of the ALJ's analysis of this case on several scores, but we find that substantial evidence supported the ALJ's denial of this claim.

At the outset, we discern no error in the ALJ's analysis of the medical opinion evidence. In this regard, it is clear that:

> [W]e are no longer bound by a treating source rule. Instead, it is now clear that persuasiveness is the touchstone for any medical opinion evaluation. Further, it is well settled that "supportability ... and consistency ... are the most important factors [to] consider when [ ] determine[ing] how persuasive [to] find a medical source's medical opinions ... to be." 20 C.F.R. § 404.1520c(b)(2). In this context, supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Consistency, in turn, is defined to mean that: "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1)-(2).

Sager v. Kijakazi, No. 3:21-CV-100, 2022 WL 773917, at *15 (M.D. Pa. Feb. 11, 2022), report and recommendation adopted, No. 3:21-CV-00100, 2022 WL 757237 (M.D. Pa. Mar. 11, 2022).

In this case, substantial evidence supported the ALJ's decision that the state agency expert and consulting examining source medical consensus supported a finding that Spataro could perform simple tasks in a low stress work environment. On this score, this medical consensus was supported by, and consistent with, the clinical evidence. Over a two-year period, these treatment notes often described

Spataro's appearance, speech, affect, mood thought processes and content, intellect and orientation as normal. (Tr. 392, 396, 399-400, 415, 420, 422, 425, 428-29, 431-32, 435, 437, 589, 591-96, 663, 665, 667, 676, 679, 694). Spataro's insight was also repeatedly described as normal or adequate. (Id.) Moreover, her caregivers also typically rated Spataro's Global Assessment of Functioning or GAF score as ranging between 54 and 60, a GAF scores which represent no more than a moderate degree of impairment. (Tr. 409, 420, 422, 425, 600).

Further the narratives accompanying these treatment notes indicated that Spataro's anxiety was relatively well controlled on her current medications, (Tr. 392, 396, 399-400, 415, 420, 422, 425, 428, 429, 431-32), and described her mood as stable. (Tr. 409). In fact, the treatment notes provided by Spataro's counselor, Kenneth Fulton-Resig, recorded improvement in her condition over time. Thus, on January 16, 2020, Fulton-Resig reported that Spataro had been doing well, and on February 13, 2020, he noted that Spataro had described some major revelations she had attained. (Tr. 402-03). By April 27, 2020, Fulton-Resig stated in his treatment notes that Spataro "has been doing much better in the past few months than ever before." (Tr. 394). Finally, these treatment notes also stated that Spataro had an ongoing interest and perceived ability to work. As early as November 13, 2018, Spataro reported that she was employed as a security guard at a school. (Tr. 598). In

29

April of 2019, Spataro admitted to experiencing depression when working night shifts. (Tr. 431). In December of 2019, Spataro described looking for work and receiving a job offer which she intended to accept. (Tr. 410-11). Further, by January of 2020, in her treatment sessions with Fulton-Resig Spataro discussed "her current working situation, and ability to work (small shifts) to gain money for short term travel." (Tr. 406).

Given the cardinal importance which the Commissioner's regulations now place on consistency and supportability in assessing medical opinions, this benign clinical history spanning two years of treatment fully supported, and was entirely consistent with, the opinions from those medical opinions who found that Spataro could perform simple tasks. Therefore, under the governing legal paradigms, substantial evidence supported the ALJ's decisions that these medical opinion were persuasive. There was no error here.

Likewise the ALJ's decision to reject the extreme views expressed by Spataro's treating sources, including Mr. Fulton-Resig, was well supported by the record. Simply put, these opinions failed the consistency and supportability test prescribed by the regulations. As the ALJ aptly noted, these treating source statements were difficult to reconcile with one another, and were inconsistent with Blue Mountain's contemporaneous treatment notes. For example, in March of 2020,

Fulton-Resig reported that Spataro had no impairment following simple instructions, moderate impairments in some other work spheres, and marked or extreme impairments in maintaining concentration, and interacting with others. (Tr. 387-89). Yet on April 27, 2020, Fulton-Resig stated in his treatment notes that Spataro "has been doing much better in the past few months than ever before." (Tr. 394). Moreover, other treatment notes from March 2020 described Spataro's appearance, speech, affect, mood, thought processes and content, intellect, and orientation as normal. (Tr. 399). By November 2020, Fulton-Resig now asserted that Spataro faced extreme limitations in nearly all intellectual aspects of workplace functioning. (Tr. 701-03). However, this sudden shift in Fulton-Resig's assessment was not borne out by treatment notes, which continued to describe Spataro's appearance, speech, affect, mood, thought processes and content, intellect, and orientation as normal. (Tr. 435, 437). Moreover, Fulton-Resig's attempt to harmonize these discordant reports by suggesting that "normal" simply meant normal for Spataro, (Tr. 68), was properly discounted by the ALJ who concluded that this strained interpretation was "just not persuasive and highly disingenuous in light of the complete record." (Tr. 32).

Finally, Spataro's general critique of the RFC assessment in this case is also unavailing. While Spataro invites us to discount this RFC determination, it is clear that:

[T]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. <u>Chandler</u>, 667 F.3d at 361. RFC is defined as " 'that which an individual is still able to do despite the limitations caused by his or her impairment(s).' " <u>Burnett</u>, 220 F.3d at 121 (3d Cir. 2000) (quoting <u>Hartranft v. Apfel</u>, 181 F.3d 358, 359 (3d Cir. 1999)). It reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In assessing the RFC, the ALJ must consider all the evidence of the record and, regardless of its source, "evaluate every medical opinion ... receive[d]." <u>Burnett</u>, 220 F.3d at 121 (internal citations omitted). The Court's "review of the ALJ's assessment of the [claimant]'s RFC is deferential," and the "RFC assessment will not be set aside if it is supported by substantial evidence." <u>Black v. Berryhill</u>, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018); <u>see also</u> <u>Martin v. Comm'r of Soc. Sec.</u>, 547 F. App'x 153, 160 (3d Cir. 2013) ("We examine the ALJ's conclusions as to a claimant's RFC with the deference required of the substantial evidence standard of review." (internal quotation marks omitted)).

<u>Stancavage</u>, 469 F. Supp. 3d at 339.

In this case, substantial clinical evidence and a broad medical expert consensus all supported the notion that the plaintiff retained the residual functional capacity to perform simple tasks in a low stress work environment. Since we are obliged to sustain an ALJ's decision whether substantial evidence; that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, supports that decision, this high quantum of proof supporting the ALJ's determination of Spataro's ability to work is fatal to this appeal.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

                                        */S/ Martin C. Carlson*
                                        Martin C. Carlson
                                        United States Magistrate Judge

DATED: March 15, 2023